STATE OF WEST VIRGINIA *ex rel.* WALLACE BUMGARNER

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 10623)

Submitted October 6, 1953.   Decided December 15, 1953.

94

*Wm. S. Ryan,* for relator.

*John G. Fox,* Attorney General, *Fred H. Caplan,* Assistant Attorney General, for respondent.

RILEY, JUDGE:

Wallace Bumgarner, invoking the original jurisdiction of this Court, instituted this proceeding in mandamus against Edgar B. Sims, Auditor of the State of West Virginia, for the purpose of commanding the auditor to honor the requisition of the State Board of Control for two thousand dollars, the amount awarded to petitioner by the State Court of Claims and appropriated by the Budget Act for the ensuing biennium of 1953-55, contained in Chapter 1, Acts of the Legislature, First Extraordinary Session, 1953.

The Court of Claims found that petitioner's claim in the amount of two thousand dollars was based upon a moral obligation, and by Chapter 29, Acts of the Legislature, Regular Session, 1953, the Legislature, *inter alia,* adopted the findings of fact of the Court of Claims, declared petitioner's claim to be a moral obligation of the State, and directed the auditor to issue a warrant for the payment thereof "out of any fund appropriated and available for the purpose."

This case was heard in this Court upon the original petition (hereinafter designated as the "petition") of the claimant, Wallace Bumgarner; upon respondent's demurrer filed to the petition; upon respondent's answer to the petition; upon petitioner's demurrer and replication to respondent's answer; upon the amended petition filed by the claimant; upon the transcript of the evidence bearing on the instant claim, introduced before the State Court of Claims, and the transcript of the evidence in the law action of Wallace Bumgarner against I. M. Coiner in the Circuit Court of Roane County, which transcripts were made a part of the record in this proceeding by the written stipulation of counsel for petitioner and counsel for the respondent.

The petition alleges that the respondent, Edgar B. Sims, is the duly elected and qualified Auditor of the State of West Virginia, having the legal duty to order by payment all valid obligations of the State of West Virginia, or its duly constituted agencies, including the State Board of Control, when payment of the same have been approved by specific appropriations made available to the State Auditor.

The petition alleges that on or about May 20, 1950, the petitioner was walking along a public road from Reedy, in Roane County, to his home near Palestine, in Wirt County; and that I. M. Coiner, who was employed by the State Board of Control as a captain of the guards at West Virginia Penitentiary in charge of a prison road camp, located in Roane County, while driving along the road in search of an escaped convict, overtook the petitioner, and without warning shot him through the thigh with a pistol, severely injuring him.

From the petition it appears that petitioner in the Circuit Court of Roane County instituted against Coiner an action for damages for personal injuries, which petitioner received as the result of having been shot, and obtained a judgment for three thousand dollars.

It also appears from the petition that application for a writ of error to the judgment of the circuit court was made to this Court and refused; that thereafter executions were issued on the judgment, which were returned unsatisfied with no property found and no part of the judgment paid; that on or about December 19, 1951, Coiner was adjudicated a bankrupt; that in the bankruptcy proceeding no assets were listed from which petitioner could be paid the whole or any part of the judgment; and that Coiner was later discharged from bankruptcy.

The petition sets forth in detail that petitioner's claim for three thousand dollars, the amount awarded by the jury in the law action in the Circuit Court of Roane County, and for which judgment was rendered, was filed with the State Court of Claims, and the petition alleges that after due notice having been given to the interested parties and careful investigation, including an examination of a transcript of all evidence taken in the law action, lately pending in the Circuit Court of Roane County, the court of claims awarded to petitioner the sum of two thousand dollars; and the petition alleges that the award having been duly certified by the State Court of Claims to the Regular Session of the 1953 Legislature, the Legislature made an appropriation in an amount equivalent to the award and authorized payment to petitioner, Wallace Bumgarner, of two thousand dollars, as a claim against the State Board of Control to be paid from the general revenue fund.

The petition alleges that pursuant to the appropriation a requisition was drawn upon the State Auditor, Edgar B. Sims, for the two thousand dollars appropriated, which requisition the auditor arbitrarily refused to honor, and still fails and refuses to honor, and to issue a warrant therefor, without any legitimate cause or excuse.

The petition alleges generally that the acts of the respondent, Edgar B. Sims, Auditor of the State of West Virginia, in refusing to recognize the validity of the award made by the Court of Claims and the appropriation

effected by the Legislature are without justification, contrary to the laws of the State of West Virginia, and are arbitrary and capricious, and in disregard of respondent's duties as Auditor of the State of West Virginia.

On October 6, 1953, the respondent Auditor filed a demurrer to the petition. The demurrer sets forth as grounds thereof that the petition does not allege that a moral obligation on the part of the State to compensate petitioner has been declared by the Legislature; that the facts alleged in the petition do not disclose a moral obligation on the part of the State to compensate petitioner; and do not disclose a legal obligation on the part of the State to do so. As further grounds of demurrer the respondent's demurrer alleges that the Legislative appropriation is unconstitutional, because it is for a purely private purpose beyond the powers of the Legislature, and is a mere gift, being tantamount to a grant of the credit of the State in aid of private persons in violation of Article X, Section 6 of the Constitution of West Virginia, and, therefore, such appropriation is null and void.

And, finally, the demurrer states that the petition does not contain any allegation which would tend in any manner to indicate that Coiner acted negligently, carelessly, recklessly, or intentionally in inflicting the injury upon which the claim is based.

On October 5, 1953, respondent filed an answer which admits all facts well pleaded in the petition, including the fact that respondent, as Auditor, is under the legal duty to honor by payment all valid obligations incurred and held against the State of West Virginia, when specific appropriations are made available by the State Legislature for such payment, except those expressly denied in the answer. The answer denies all conclusions of law stated in the petition; the allegation of the petition that Coiner overtook the petitioner and without warning started shooting at him with a pistol; the allegation in the petition that respondent acted arbitrarily in refusing to honor the requisition by the issuance of a warrant in pay-

ment of the amount appropriated by the Legislature, for the reason that the allegation of arbitrary action is a conclusion of law; and that respondent acted capriciously or in disregard of his official duties in refusing to honor the requisition and to compensate petitioner.

On October 6, 1953, the petitioner filed an amended petition, which, in addition to the allegations contained in the original petition, alleges: (1) That by Chapter 29, Acts of the Legislature, Regular Session, 1953, the Legislature adopted the findings of fact of the court of claims, declaring that petitioner's claim in the amount of two thousand dollars is a moral obligation of the State to pay, and directed that the respondent Auditor issue a warrant for the payment of the award of the State Court of Claims in plaintiff's favor from any fund appropriated and available for the purpose; and (2) that the "Legislature [in the Budget Act contained in Chapter 1, Acts of the Legislature, First Extraordinary Session, 1953] made an appropriation in an amount equivalent to said award, and duly authorized payment * * *" to be made from the general revenue fund.

On the same day, October 6, 1953, the petitioner filed a demurrer and general replication to respondent's answer, in which demurrer petitioner asserts that the answer is not sufficient in law, because it makes no denial of the material allegations of the petition, and sets forth no legal reason for respondent's refusal to issue a warrant for the sum of two thousand dollars to petitioner in conformity with the appropriation made by the Legislature.

The evidence adduced before the State Court of Claims and in the jury trial, bearing on the question whether Coiner in firing the shots at petitioner and wounding him, was guilty of negligence or wilful misconduct, is in direct conflict. As Coiner and the petitioner were the only eyewitnesses to the shooting, their testimony alone bears upon this question.

About nine or nine-thirty on the evening he was shot, Bumgarner, a young farm worker twenty-six years old,

was walking along that part of State Route No. 14 which lies in Roane County, from the Town of Reedy to his home near Palestine. As Bumgarner was proceeding along the road in the direction of his home, I. M. Coiner, a captain of the guards at the West Virginia Penitentiary, then in charge of a prison road camp, and as such authorized by the Warden of the Penitentiary to carry firearms, which authority was evidenced by a "gun permit", was driving along the road in search of a prisoner who had escaped from· the prison road camp, stopped his automobile at a place on the road near where Bumgarner was walking, and, according to petitioner, Coiner as soon as he stopped his car told him, "Right here I am going to let you have it"; and when petitioner told Coiner not to shoot him, the former "stuck the gun in my face and I started to run". Bumgarner testified that Coiner shot at him twice, and that the second shot struck him, the bullet piercing petitioner's right leg above the knee from the rear to the front thereof. Thereupon Bumgarner cried out, and evidently fell to the ground, where he was cared for by a boy named Hugh White and other kindly disposed people in the neighborhood, who, having heard the shot and Bumgarner's outcry, came to his assistance.

Bumgarner testified further that Coiner started to shoot when he was about twenty feet away from the Coiner automobile, but whether he shot one or both of the shots while seated in the automobile, or whether he left the car and then fired the shots, Bumgarner either did not remember or did not observe. When in the act of running toward the back of Coiner's automobile and away from Coiner, the second shot struck him in the leg, Bumgarner testifying at that time he was about twenty feet away from the automobile.

At the time he was shot Bumgarner was dressed in a gray shirt and a pair of khaki trousers, and Coiner was not in uniform and did not exhibit to Bumgarner a badge, or wear any other indicia of authority.

Coiner testified that on the evening of May 20, 1950,

about nine-thirty, he started out by automobile from the prison road camp to which he had been assigned as a captain of the guards of West Virginia Penitentiary, in search of a prisoner who had escaped from the camp on the previous day. Upon leaving the camp he headed his automobile toward Elizabeth, in Wirt County. When he was just beyond the Roane County line and had entered Wirt County, this witness saw a man standing on the berm of the road "thumbing" a ride. The man's hair was ruffled, his shirttail was outside his trousers, his mouth was open, and, to use Coiner's exact language, "He looked like a man that had just come out of the woods tired and worn out, and he looked like the prisoner I was looking for". For the purpose of ascertaining the identity of this man, who, the record establishes beyond peradventure, was the petitioner and not the escaped prisoner, Coiner testified he drove past petitioner toward Palestine for a short distance, and then turned around and drove the car back and "pulled by the side of the man." Coiner testified in contradiction to Bumgarner's testimony that he told Bumgarner he was under arrest, and admonished him not to run; and that forthwith Bumgarner started to run, "I guess it would be down the road, anyhow to Palestine to the back of my car." Coiner stated that he left his car and ran to the back of it as quickly as he could; that he shot two shots into the ground in the berm of the road, thinking that Bumgarner would stop running, but he did not; and that as Bumgarner ran from the right berm of the road at an angle across to the left berm, witness said he fired one shot at Bumgarner's leg. Thereupon, Bumgarner cried out, which witness testified led him to believe that he had shot the man, but that he was not sure of this. Then, according to Coiner's testimony, he turned his car around with the thought that if the man had been shot, he would probably stop running shortly and give himself up. The witness then drove back toward Palestine for a short distance, but did not see anyone, and so he turned around and drove back to the prison camp as quickly as possible, where he obtained the assistance of one Fielder, a fellow-

guard at the prison camp, and then drove back to the scene of the shooting for the purpose of making a search for Bumgarner in a nearby field. When, however, Coiner and him to the hospital"; that one of the men asked whether saw a pick-up truck with the lights on parked on or along the road, with three or four men standing nearby, and a man lying on the berm of the road, who, witness testified, he thought was the man he had shot. Passing the parked truck and the prostrate man, Coiner turned around, and drove back, and was informed by someone that the man lying on the ground had been shot.

Coiner says that he said to one of the men standing there, "If you will help me load him in the car, I will take him to the hospital"; that one of the men asked whether he had better "wait until the law comes"; and that witness replied that in case the injured man was just wounded that it would be better to take him to the hospital as soon as possible. The injured man was then placed in Coiner's automobile, wrapped in a blanket, and taken to the hospital as quickly, so Coiner testified, as he could, with the exception that he stopped at the prison camp. On the way to the hospital, the injured man complained of nausea, so witness stopped at the camp "for probably a minute and got some ammonia", evidently aromatic spirits of ammonia. At the camp Coiner testified he told the guard who had accompanied him to call Dr. DePue, evidently Dr. J. M. DePue, a physician practicing in Spencer, Roane County, and tell the physician that witness had shot a prisoner, and that he would like for the doctor to try to reach the hospital at Spencer by the time Coiner arrived there with the injured man. This latter testimony was objected to as hearsay, but admitted because the court thought the error, if any, was harmless.

It seems that Coiner realized for the first time that the injured man was not the escaped prisoner when the petitioner was placed under the lights on the operating table at the hospital. Coiner testified that though the man looked like the prisoner, he was doubtful because the

escaped prisoner had a large scar on the side of his face, but he "looked at Mr. Bumgarner and he has a scar but it wasn't as large."

Upon such realization, and as witness and Fielder were leaving the hospital, Coiner told Fielder: "this man may be an escaped prisoner. There is some loose at the camp at Gypsy and some at Huttonsville. But that is not the man I thought he was. I undoubtedly have shot the wrong man." Fielder then suggested that they go back into the hospital to see if the person shot had anything on him whereby he could be identified, and Fielder got an identification from the petitioner, which proved that the injured man was, in fact, the petitioner, Wallace Bumgarner, and when questioned Bumgarner told Fielder that his name was "Wallace Bumgarner"; and that he lived near Palestine.

At the time he shot Bumgarner, according to Coiner, Bumgarner was dressed in a blue or gray shirt and khaki trousers, which apparel was similar to that worn by the prisoners at the camp.

On cross-examination Coiner testified that he did not see the scar on Bumgarner's face, because of the darkness; and on further cross-examination Coiner testified that when he drove back on the road along side of Bumgarner, he said "Rabbit, [evidently a nickname of the escaped prisoner] you are under arrest"; and "Don't run." He denied that he said, "Rabbit, I have got you", and then started to shoot. Further on cross-examination Coiner testified that after he fired the last shot, he could hear Bumgarner running, and that he did not know that Bumgarner "was down; I didn't even know that I had hit him"; but witness thought he had hit Bumgarner from the fact that the latter cried out just after the shot was fired.

At the jury trial evidence was introduced concerning Bumgarner's injuries. It was established that the shot in piercing Bumgarner's right leg did not sever or strike a bone, artery or leader of Bumgarner's leg; but peti-

tioner testified, without contradiction, that he continues to suffer some pain in his leg.

Largely on the basis of the foregoing evidence the jury in the action instituted by the petitioner against Coiner in the Circuit Court of Roane County found a verdict for the petitioner in the amount of three thousand dollars, and on the basis of this testimony, as well as the evidence adduced before the State Court of Claims, that court found that Coiner was negligent in shooting the petitioner, and made an award in the amount of two thousand dollars, which award the State Court of Claims found was based upon a moral obligation of the State to pay.

The basic question presented by this record is whether the appropriation in the amount of two thousand dollars made by the Legislature in the Budget Act for the 1953-55 biennium, contained in Chapter 1, Acts of the Legislature, First Extraordinary Session, 1953, is unconstitutional because it contravenes the provision of Article X, Section 6, of the West Virginia Constitution, that "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; * * *"; and the provision of Article VI, Section 35, West Virginia Constitution, that, "The state of West Virginia shall never be made defendant in any court of law or equity, * * *."

If the appropriation for two thousand dollars in payment of the award in petitioner's favor is based upon a moral obligation of the State to pay, the appropriation is not violative of either of these constitutional provisions. *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805; *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465; *Price* v. *Sims,* 134 W. Va. 173, 58 S. E. 2d 657.

As the Legislature by the enactment of Chapter 29, Acts of the Legislature, Regular Session, 1953, has declared that

there is a moral obligation on the part of the State to compensate petitioner, and the amended petition so alleges, petitioner's pleadings fully meet the requirements set forth in *State ex rel. Adkins* v. *Sims,* 127 W. Va. 786, 34 S. E. 2d 585. If the findings of fact by the Legislature, contained in Chapter 29, Acts of the Legislature, Regular Session, 1953, adopting the findings of the State Court of Claims, and declaring that petitioner's claim in the amount of two thousand dollars is based upon a moral obligation of the State to pay petitioner and is based upon facts sufficient so that this Court cannot hold, under the well established rules set forth in the foregoing authorities, that the Legislature's finding of fact is clearly wrong and against a preponderance of the evidence adduced in the trial of the law action, which petitioner instituted against I. M. Coiner in the Circuit Court of Roane County, and the evidence adduced before the State Court of Claims, all of which was certified to the Legislature, the appropriation in petitioner's favor is valid, and it is the duty of the respondent auditor to honor the requisition of the State Board of Control by the issuance of a warrant in payment to petitioner of the amount of the appropriation. If the conduct of Coiner, the State's employee, was such as would base an action for damages for negligence between private persons, a moral obligation on the part of the State exists. This postulate has been stated and restated by this Court in the cases heretofore cited, and has been settled in particular by the decisions in the cases of *Price* v. *Sims, supra,* and *State ex rel. Utterback* v. *Sims,* 136 W. Va. 822, 68 S. E. 2d 678.

In *Price* v. *Sims, supra,* the settled law governing the appropriation of public moneys by the Legislature for the payment of claims based upon a moral obligation on the part of the State to pay is stated in detail in points 1 and 2 of the syllabus of the *Price* case, as follows:

"1. A moral obligation of the State, declared by the Legislature to exist in favor of a claimant for negligent injury to his property, will be sustained, and a legislative appropriation of public funds

made for its payment will be upheld, when the conduct of agents or employees of the State which proximately caused such injury is such as would be judicially held to constitute negligence in an action for damages between private persons.

"2. A claim for damages to property injured by the negligence of an agent or an employee of the State, while engaged in the discharge of a governmental function, may form the basis of a valid moral obligation of the State and justify a legislative appropriation of the public funds of the State for the payment of such claim."

In point 1 of the syllabus of *State ex rel. Utterback* v. *Sims,* 136 W. Va. 822, 68 S. E. 2d 678, points 1 and 2 of the syllabus in *Price* v. *Sims, supra,* heretofore quoted, were approved and applied; and in point 2 of the syllabus in the *Utterback* case, in accordance with the norm governing the adjudication of cases involving the moral obligation of the State, stated in point 4 of the syllabus in *State ex rel. Cashman* v. *Sims, supra,* the Court held: "A claim for personal injuries caused by the negligence of an agent or an employee of the State, while engaged in the discharge of a governmental function, may form the basis of a valid moral obligation of the State and justify a legislative appropriation of public funds of the State for the payment of such claim." In the opinion in the *Utterback* case this Court observed: "A majority of the members of this Court is also unwilling to depart from the decisions of this Court in *State ex rel. Davis Trust Company* v. *Sims,* 130 W. Va. 623, 46 S. E. 2d 90; *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465; *State ex rel. Jordan* v. *Sims,* 134 W. Va. 167, 58 S. E. 2d 650; *Saunders* v. *Sims,* 134 W. Va. 163, 58 S. E. 2d 654; and *Price* v. *Sims,* 134 W. Va. 173, 58 S. E. 2d 657, in each of which the declaration by the Legislature of a moral obligation of the State, arising from the negligence of its officers, agents or employees in the exercise of a governmental function was held to be valid. The holdings of this Court in those cases are adhered to and approved and are declared to be the settled law of this State upon the questions involved in those decisions."

So the question immediately before us is whether in the circumstances portrayed by the records had in the law action in Roane County, and before the Court of Claims, Chapter 29, Acts of the Legislature, Regular Session, 1953, in which the Legislature adopted as its own the finding of the Court of Claims that Coiner, as the State's employee, was negligent in shooting the petitioner, and in which it was declared that the State was under the moral obligation to pay petitioner's claim, is a valid enactment. This is a judicial question. The finding and declaration of the Legislature, however, are entitled to respect, but the determination of that question, being juristic in character, is for the courts. *State ex rel. Cashman* v. *Sims, supra; Price* v. *Sims, supra; Utterback* v. *Sims, supra;* and *State ex rel. Cox* v. *Sims,* 138 W. Va. 482, 77 S. E. 2d 151.

Initially, it should be observed that Coiner at the time he shot the petitioner must be regarded as an employee of the State by reason of his employment by the State Board of Control, which is a direct agency of the State and an integral part thereof. *Miller Supply Co.* v. *State Board of Control,* 72 W. Va. 524, 78 S. E. 672; *State ex rel. Gordon* v. *State Board of Control,* 85 W. Va. 739, 102 S. E. 688. See also *Mahone* v. *The State Road Commission of West Virginia,* 99 W. Va. 397, 129 S. E. 320, which involved an action instituted by the plaintiff therein for the purpose of asserting liability for a tort.

At the time petitioner was shot Coiner, as the State's employee, was clearly acting within the scope of his employment in attempting to apprehend a prisoner, who theretofore had escaped from the prison camp in which Coiner was employed as a captain of the guards. Under Code, 28-5-5, Coiner had the right to carry firearms and concealed weapons while on official duty, which duty extended to him "in travelling from place to place within the State for the purpose of * * * pursuing and apprehending escaped convicts * * *"; and the prisoner, who Coiner was seeking to apprehend, was a fleeing felon under Code, 61-11-1, because of his conviction of a crime punishable

by confinement in the penitentiary and by escaping from the prison camp to which he had been committed, he had committed a felony under Code, 62-8-1, which was separate from that for which he initially had been sentenced to the penitentiary.

If, as Coiner drove his automobile to the place on the public road where Bumgarner was walking, Coiner believed and had reason to believe that Bumgarner was, in fact, the escaped convict, and Coiner believed and had reason to believe that it was necessary in the circumstances, in order to apprehend the suspected escapee, to shoot the suspect in order to apprehend him, under the common-law rule, which obtains in this State, a public officer, charged with the duty to apprehend a fleeing felon may wound, and even kill, the escapee, if such action be necessary in order to effect his apprehension, and in using such force the officer is presumed to act in good faith. *Thompson* v. *Norfolk and Western Railway Co.*, 116 W. Va. 705, 706, pt. 4 syl., 182 S. E. 880. But in so doing, as stated in Point 4 of the syllabus of the *Thompson* case, the officer's "conduct will be appraised in the light of the circumstances as they appeared to him at the time, extreme measures are always to be cautiously employed by the officer, as he is not the ultimate authority to judge of the necessity therefor. Unnecessary severity is not sanctioned by the law, and will be penalized."

While the evidence contained in the records made in the law action in Roane County and in the Court of Claims, which the Legislature had before it in adopting the findings of fact of the Court of Claims and in declaring that the State had the moral obligation to pay petitioner's claim, is in direct conflict, the legislative findings of fact and the declaration that a moral obligation exists, justify this Court in resolving the conflict in the evidence in petitioner's favor, if the evidence is probative and credible. Thus the question before us is the same which we would have in deciding on a jury verdict in favor of a plaintiff, as if this proceeding had been an action at law between

private persons. In point 1 of the syllabus in *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115, this Court held: "Before directing a verdict in a defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence." *Boyce* v. *Black,* 123 W. Va. 234, pt. 1 syl., 15 S. E. 2d 588; *Wilson* v. *Co-Operative Transit Co.,* 126 W. Va. 943, 945, 30 S. E. 2d 749; *Adkins* v. *Raleigh Transit Co.,* 127 W. Va. 131, 135, 31 S. E. 2d 775; *Billy* v. *Powell,* 133 W. Va. 278, 282, 55 S. E. 2d 889; *Laphew* v. *Consolidated Bus Lines,* 133 W. Va. 291, 294, 55 S. E. 2d 881; *Frampton* v. *Consolidated Bus Lines,* 134 W. Va. 815, 823, 62 S. E. 2d 126; *Spence* v. *Browning Motor Freight Lines,* 138 W. Va. 748, 77 S. E. 2d 806.

Though the doctrine of *respondeat superior* is not applicable to the State because of the State's immunity from suit under Article VI, Section 35, West Virginia Constitution, this Court has tacitly applied the rationale of the doctrine in the several cases in which declarations by the Legislature of moral obligations on the part of the State, arising from the negligence of its officers, agents and employees in the exercise of governmental functions, were held to be valid. *State ex rel. Davis Trust Co.* v. *Sims, supra; State ex rel. Catron* v. *Sims, supra; State ex rel. Jordan* v. *Sims, supra; Saunders* v. *Sims, supra;* and *Price* v. *Sims, supra.*

The instant case is somewhat analagous to the cases of *Layne* v. *The Chesapeake and Ohio Railway Co.,* 66 W. Va. 607, 67 S. E. 1103; and *Moss* v. *Campbell's Creek Railroad Co.,* 75 W. Va. 62, 83 S. E. 721, L. R. A. 1915C, 1183; *McKain* v. *The Baltimore and Ohio Railroad Co.,* 65 W. Va. 233, 64 S. E. 18, 23 L. R. A. (N. S.) 289, in which this Court has held that an employer will be held liable for injuries inflicted upon a third person by the employer's special officer, who, at the time the injuries were inflicted, was acting within the scope of his private employment.

This case, involving as it does an alleged tort, must be appraised as though it were a law action by a plaintiff to recover from the defendants, master and servant, damages for personal injuries on the basis that the servant is liable because of his own negligence, and the master is liable because of the servant's negligence under the doctrine of *respondeat superior*. So applying the rule in the case of *Fielder, Admx.* v. *Service Cab Co., supra,* and the kindred cases heretofore cited, it is our duty to resolve the conflict in the evidence, bearing on the factual question of negligence, in the light most favorable to the petitioner. Therefore, we take as true petitioner's testimony that as he was walking along State Route No. 14 in the direction of his home, Coiner, acting as a captain of the guards at the West Virginia Penitentiary and in search of a fleeing convict, was driving along State Route No. 14 in furtherance of his search, and, upon seeing Bumgarner, stopped his automobile at a place on the road near where Bumgarner was walking; and thereupon told petitioner, "Right here I am going to let you have it", and then Coiner "stuck the gun in my face and I started to run." We likewise must take as true the evidence that Coiner shot at petitioner twice, and that the second shot struck petitioner, the bullet piercing his right leg above the knee from the rear to the front thereof. Also we must take as true that Coiner did not realize that petitioner was not the fleeing convict, although Coiner knew the escapee by a nickname, and knew the escapee had a large and noticeable scar on his face, while petitioner carried only a slight scar, which was hardly discernible. Likewise the evidence to the effect that Coiner was not in uniform and did not exhibit to petitioner a badge or any other indicia of authority, and suddenly without warning, except for the above-quoted threat, Coiner pointed the weapon at petitioner's face, and as petitioner started to run, he shot him, must also be taken as true. Moreover, there is nothing in this record which would indicate that Coiner at and before the time he shot Bumgarner made any inquiry of petitioner as to his identity.

We think that if this proceeding were a law action to recover damages for personal injuries, the evidence portrayed by the record herein would present a question for jury determination whether Coiner was negligent in shooting the petitioner.

Arising on this record is the interesting question whether the unsatisfied judgment in petitioner's favor and against Coiner alone, entered by the Circuit Court of Roane County in the action at law instituted by the petitioner against Coiner, and whether Coiner's bankruptcy and his discharge in the bankruptcy proceeding, without any satisfaction of petitioner's claim, either in whole or in part, would serve to release Coiner's employer, if such employer were a private person and not the State of West Virginia.

In this jurisdiction a joint action of tort may be instituted against a master and servant in a case in which the plaintiff's injuries were occasioned solely by the negligence of the servant, and the only ground for holding the master liable is that furnished by the doctrine of *respondeat superior*. *Humphrey* v. *Virginian Railway Co.*, 132 W. Va. 250, 54 S. E. 2d 204; *Billy* v. *Powell, supra*; *O'Dell* v. *Universal Credit Co.*, 118 W. Va. 678, pt. 1 syl., 191 S. E. 568. Subject to the rule set forth in points 3 and 4 of the syllabus of the *Humphrey* case that where the master's duty is absolute and nondelegable, or where the liability of the master is not predicated solely upon the negligence of the employee impleaded, but upon the negligence of another employee, or that of the master himself, an acquittal by a jury of the servant in an action instituted against the master and servant to establish liability based solely on the servant's negligence will not release the master. The relation of master and servant in those cases, in which the doctrine of *respondeat superior* applies, is joint, and the parties should be regarded as though they were joint tort-feasors. *Wills* v. *Montfair Gas Coal Co.*, 97 W. Va. 476, 125 S. E. 367. In some respects, however, the relation may be regarded as joint and several. See

*Chewning* v. *Tomlinson,* 105 W. Va. 76, 141 S. E. 532, 65 A. L. R. 1088n and 1090n, and *O'Dell* v. *Universal Credit Co., supra,* in the latter of which cases this Court, speaking through Judge Hatcher on page 680 of the opinion said: "Plaintiff's cause of action against Hager [the servant] and defendant was in its nature joint and several." See *Wellman* v. *Fordson Coal Co.,* 105 W. Va. 463, 143 S. E. 160, which involved a joint action against a master and servant instituted by a third party to recover for injuries caused by the servant's negligence; and *Fleming* v. *Nay,* 120 W. Va. 625, 200 S. E. 577, that where the master is under the absolute duty and recovery can be had on his failure to perform the duty, where the servant is joined with the master in an action at law to recover damages, and he is negligent in the performance of his duties and acts within the scope of his employment, the doctrine of *respondeat superior* does not relieve the servant of his tort liability. See also *Wills* v. *Montfair Gas Coal Co., supra.*

The common-law rule in the Virginias, governing the liability of tort-feasors, is aptly stated in 1 Barton's Law Practice, Second Edition, Section 75, as follows: "* * * A joint action for trespass lies against several defendants, but the liability of tort feasors is several as well as joint, and although the plaintiff may sue one wrong-doer, he is not thereby prevented from also suing the others; but if a judgment has been obtained against one tort feasor, and that has been fully satisfied, the action will not lie against the others." This rule has, in other jurisdictions, been applied in actions against principal and agent. *Maple* v. *Cincinnati H. & D. R. Co.,* 40 Ohio St. 313, 48 Am. Rep. 685; *Betcher* v. *McChesney,* (Pa. St.) 100 A. 124; 2 Freeman, Judgments, 5th ed., Section 574.

In this jurisdiction the common-law rule stated in 35 Am. Jur., Master and Servant, Section 535, that "Where both master and servant are liable to a third party for a tort of the servant, a valid release of either master or servant from liability for the tort operates to release the other," has been abrogated, in part, by Code, 55-7-12. Sec-

tion 12 reads: "A release to, or an accord and satisfaction with, one or more joint trespassers, or tort feasors, shall not inure to the benefit of another such trespasser, or tort feasor, and shall be no bar to an action or suit against such other joint trespasser, or tort feasor, for the same cause of action to which the release or accord and satisfaction relates." Section 12 was amended by the adoption of the Official Code, 1931, by substituting the words "one or more joint trespassers" for the words "one joint trespasser"; and the words "or tort-feasor" were inserted in the statute. The substitution and addition of the new words were made, according to the Revisers' Note, to express more clearly the obvious intent of the statute, and "to indicate that this section applies to all joint wrong doers, as is held in *Leisure* v. *Monongahela Valley Traction Co.*, 85 W. Va. 346, 101 S. E. 737." In the *Leisure* case this Court held that though the statute was not especially applicable to joint tort-feasors, a plea, filed in an action for damages for an injury alleged to be the result of the negligence or tort of another, which charges that the negligence alleged is the joint negligence of the defendant and another person, and that the plaintiff has received satisfaction from such other person and has executed a release therefor, does not interpose a bar to an action by the injured party against a joint tort-feasor with whom no settlement has been made.

Under the common law rule in England, the liability to an injured person by a tort-feasor, who acted jointly with another, is joint and several in the sense, as stated in F. Pollock's, The Law of Torts, Thirteenth Ed., page 202, that: "Where more than one person is concerned in the commission of a wrong, the person wronged has his remedy against all or any one or more of them at his choice. * * *. But when the plaintiff in such a case has made his choice, he is concluded by it. After recovering judgment against some or one of the joint authors of a wrong, he cannot sue the other or others for the same matter, even if the judgment in the first action remains unsatisfied."

The Supreme Court of Appeals of Virginia in the early case of *Wilkes* v. *Jackson*, 2 Hen. and M. (12 Va.) 355, strictly applied the common-law rule of the Courts of England, and that rule remained in the case law in Virginia until the adoption of Section 6264, Code of Virginia, 1919, the rule being that a judgment without satisfaction against one tort-feasor operated as a release of all other tort-feasors liable for the same wrong.

The Supreme Court of the United States, however, in the case of *Lovejoy* v. *Murray*, 3 Wall. 1, refused to follow the common law rule, and held that a judgment against one joint trespasser is not a bar to a suit against another for the same trespass, and nothing short of full satisfaction, or that which the law must consider as such, can make such judgment a bar.

Expressly applicable to the instant case is the case of *Griffie* v. *McClung*, 5 W. Va. 131, 132, syl., in which this Court held that: "A judgment against one joint trespasser is no bar to a suit against another for the same trespass; nothing short of full satisfaction, or that which the law must consider as such, can make such judgment a bar." So by this decision this Court in those early days adopted the rule prevailing in the Federal Courts, and did not follow the common law rule prevailing in the Courts of England, nor the rule which prevailed in Virginia prior to the adoption of the Virginia Code in 1919. Prior to the decision in the *Griffie* case, this Court in the case of *Bloss* v. *Plymale*, 3 W. Va. 393, held that a release, not under seal, of one joint trespasser, or a satisfaction and discharge of the liability against such joint trespasser, which shows on its face that it was not the intention of the parties to the release to satisfy and discharge the liability of the other trespassers, will not be allowed to work as a discharge of a pending action against a joint trespasser. As the case of *Bloss* v. *Plymale, supra,* involved a release of one of several joint trespassers, which was dated March 22, 1866, and the case of *Griffie* v. *McClung, supra,* which involved a judgment against some, but not all, of several

joint trespassers, which was entered by the Circuit Court of Kanawha County, Virginia, (now West Virginia) in 1865, this Court, in deciding those cases, did not have under consideration the provisions of Section 7, Chapter 136, West Virginia Code of 1868.

As a corollary to the decisions in the *Griffie* and *Bloss* cases, it was held in point 2 of the syllabus in *Chewning* v. *Tomlinson, supra,* that, though a judgment against several defendants in a tort action is severable, "The collection in full of a judgment against one joint trespasser, operates as a satisfaction of a separate judgment against another such trespasser for the same injury, except as to costs. Section 7 of Chapter 136, Code, [now Code, 55-7-12] construed." In the *Chewning* case this Court awarded the relator a writ prohibiting the enforcement of an execution obtained in an action instituted before a justice of the peace by one Martin, in which Chewning and one Nickells, the latter being Chewning's master, were impleaded for a joint tort.

Code, 55-7-12, evidently was originally enacted to conform with the rule prescribed by the Supreme Court of the United States in the case of *Lovejoy* v. *Murray, supra,* that a judgment against one joint trespasser is not a bar to a suit against another for the same trespass; and that nothing short of full satisfaction, or that which the law must consider as such, will bar an action against other joint trespassers. In this regard it is to be noted that Section 12 of the present statute was originally incorporated in the statutory law of this State in Chapter 136, Section 7, of the Code of 1868, and from a printed notation in the margin of the page on which Section 7 appears, its enactment was prompted by the ruling of the Supreme Court of Appeals of Virginia in the case of *Ruble* v. *Turner*, 2 Hen. and M. 38, decided on March 3, 1808, in which the Virginia Court held that the release of one of several persons guilty of a joint tort, or an accord with and satisfaction received from, one of them, is a bar to an action as to all; "notwithstanding such release, or acknowledgment

of satisfaction, be expressed as applying only to the part which that one took in the trespass; and notwithstanding a proviso that it shall not operate in favour of the other trespassers."

As the petitioner's judgment against Coiner, entered by the Circuit Court of Roane County, was not satisfied, either in whole or in part, under the executions issued on the judgment or in the bankruptcy proceeding, the judgment, in our opinion, would not serve to bar petitioner's claim against the State of West Virginia based on a moral obligation; and we so hold under the provisions of Code, 55-7-12, and under the authority of *Griffie* v. *McClung, supra.*

The rule prevailing in this jurisdiction that a judgment against one joint tort-feasor is not a bar to a suit against another joint tort-feasor for the same tort, and nothing short of full satisfaction, or that which the law must consider as such, can make the judgment a bar to a subsequent action, is, in our opinion, just and reasonable, and is supported by the great weight of authority in the United States. 2 Freeman, Judgments, 5th ed., Section 573; *Fitzgerald* v. *Campbell*, 131 Va. 486, 109 S. E. 308, 27 A. L. R. 799, and note pages 805 to 822, inclusive; *Verhoeks* v. *Gilliban*, 244 Mich. 367, 221 N. W. 287, 65 A. L. R. 1083, and note pages 1087 to 1092, inclusive; *Hackett* v. *Hyson* (R. I.), 48 A. 2d 353, 166 A. L. R. 1096, and note pages 1099 to 1110, inclusive. See also the well annotated note in 22 Minnesota Law Review, pages 676 to 709, inclusive, and in particular pages 705, 706 and 707.

This rule, however, is subject to the exception in this jurisdiction that where one of several joint tort-feasors has obtained in this Court a writ of error to a joint judgment rendered in a trial court, resulting in a diminished judgment against the plaintiff in error, the payment of the judgment as diminished on the writ of error is an election on the part of the judgment creditor, and operates as a satisfaction of the judgment in the trial court; and an execution on the judgment against one **or more**

joint tort-feasors, who did not prosecute the writ of error, issued to collect the difference between the amounts of the two judgments, should be prohibited. *Chewning* v. *Tomlinson, supra.* This exception to the general rule, however, is not applicable to the case at bar, for the reason· that the instant case deals with a separate action against a tort-feasor, in which on executions having been issued, the amount of the judgment was not satisfied in whole or in part.

There is respectable authority in other jurisdictions to the effect that where a judgment creditor has obtained a joint judgment against two or more tort-feasors, an unsuccessful attempt by the issuance of executions to collect from one of the tort-feasors the full amount of the judgment, is a bar to obtaining an execution against the others. See American Law Reports, Anno., just cited above. We do not, however, follow the decisions to that effect, but adhere to the rule firmly established in this jurisdiction as stated in the syllabus of *Griffie* v. *McClung, supra,* that: "A judgment against one joint trespasser [tort-feasor] is not a bar to a suit against another for the same trespass [tort]; nothing short of full satisfaction, or that which the law must consider as such, can make such judgment a bar."

The final question to be considered in this case is whether Coiner's discharge in bankruptcy, with no assets available for the payment of the whole or any part of petitioner's claim, would bar an independent action against Coiner's employer, if such employer had been a private person. This question is novel in this jurisdiction, and is not without difficulty of solution.

The answer to this question is to be found in the rule that a discharge in bankruptcy, unlike the administration of a bankrupt's estate, which concerns only the distribution of the assets owned by the bankrupt at the time of the adjudication of bankruptcy, serves only to protect the assets which the bankrupt has acquired after the adjudication in bankruptcy from the claims of creditors, which

existed prior to the adjudication. *Re Loweree* (C.C.A. 2), 157 F. 2d 831. On this basis it is well established that a discharge in bankruptcy is personal to the bankrupt himself, and no other persons; and, therefore, it may be used as a defense which is personal to the bankrupt only where the bankrupt personally pleads the discharge as a bar to personal liability. *Fidelity Union Casualty Co.* v. *Hanson* (Com. App.), 44 S. W. 2d 985, affirming (Civ. App.) 26 S. W. 2d 395, cert. denied 287 U. S. 599, 53 S. Ct. 12, 77 L. ed. 522; *Alabama Great Southern Railway Co.* v. *Crawley*, 118 Miss. 272, 79 So. 94. See also *Matney* v. *Combs*, 171 Va. 244, 198 S. E. 469.

On the theory that a discharge in bankruptcy is personal to the bankrupt himself, and does not concern the assets of the bankrupt's estate, which the bankrupt had at the time he was adjudicated a bankrupt, it is provided in the Bankruptcy Act, Section Sixteen (11 U. S. C. A., Section 34) that: "The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." See 6 Am. Jur. (Revised), Bankruptcy, Section 772.

Because a discharge in bankruptcy concerns only the assets of a bankrupt at the time of the adjudication in bankruptcy, Coiner's discharge in bankruptcy, in our opinion, did not serve to vitiate petitioner's claim against the State of West Virginia, based as it is upon a moral obligation. The language of the pertinent statute, U. S. C. A., Title 11, Bankruptcy, Section 34, is broad. It evidences a legislative intent to confine the operation of the Bankruptcy Act to the assets which the bankrupt had at the time he was adjudicated a bankrupt, and does not operate to release claims against those who are liable with a bankrupt in any manner, whether the claim be liquidated, such as a debt, or unliquidated, such as a claim based upon a tort. *Lackey* v. *Steere*, 121 Ill. 598, 13 N. E. 518, 2 Am. St. 135. See also cases cited in II Co-Debtors, Notes of Decisions, 11 U. S. C. A., Section 34.

In its strict sense the word "debtor" should be defined

as one who owes to another "a sum of money due by certain and express agreement." Black's Law Dict., 4th Ed., page 490. The word "debt", however, has been interpreted as being an obligation arising otherwise than by sentence by a court for the breach of the public peace or for crime. *Ruggles* v. *State*, 120 Md. 553, 87 A. 1080, 1084, and the word "debt", as used in the broad sense, has been defined as "Any duty to respond to another in money, labor or service; it may even mean a moral or honorary obligation, unenforceable by legal action." Black's Law Dict., 4th Ed., page 491. See *United States Sugar Equalization Board v. P. DeRonde & Co., Inc.*, 7 F. 2d 981, 984 (C. C. A. Del.). See in particular *Burling* v. *Schroeder Hotel Co.*, 238 Wis. 17, 298 N. W. 207, a case involving a Federal Court order in bankruptcy concerning a tort claim.

We are, therefore, of the opinion that if this proceeding were an action between the petitioner and private persons charged with a tortfeasance as master and servant, Coiner's discharge in bankruptcy would not affect petitioner's claim; and by the same token it does not bar him from asserting a claim against the State based, as it is, upon a moral obligation.

As this proceeding under point 4 of the syllabus of *State ex rel. Cashman* v. *Sims, supra,* should be appraised as though it were a separate action at law instituted by the petitioner to collect damages against a private person, who had employed Coiner, for alleged injuries resulting from Coiner's negligence, while acting within the scope of his employment, this record suggests, though it does not give rise to for decision, two questions: (1) If the judgment of the Circuit Court of Roane County had been against petitioner and not in his favor, could that judgment under the doctrine of *respondeat superior* be interposed as a bar to a separate action against the employer, and, by the same token, to petitioner's claim against the State; and (2) if the judgment and executions thereon had been for an amount less than the amount awarded by the Legislature, would the amount of the judgment and

the executions thereon limit the amount of Bumgarner's claim against the State? See cases cited in 27 A. L. R. 812; 27 A. L. R. 816; and 60 A. L. R. 1009. We simply pose these questions for future determination, if the occasion presents itself, and in limitation of the scope of this opinion.

For the foregoing reasons the writ of mandamus prayed for, commanding the Auditor of the State of West Virginia to honor the warrant of the State Board of Control in the amount of two thousand dollars in payment of petitioner's claim, is awarded.

*Writ awarded.*

LOVINS, JUDGE, dissenting:

I respectfully dissent from the conclusions of the Court in compelling the Auditor of this State to pay petitioner the sum of $2000.00, out of State Funds. My dissent is based in part on the reasons set forth in the dissenting opinions filed in the cases of *Trust Company* v. *Sims*, 130 W. Va. 623, 46 S. E. 2d 90; *Catron* v. *Sims*, 133 W. Va. 610, 57 S. E. 2d 465; *State ex rel. Utterback* v. *Sims*, 136 W. Va. 822, 68 S. E. 2d 678, and further, for the reasons set forth in the dissenting opinions of the Honorable Fred L. Fox, late, a Judge of this Court, in the cases of *Saunders* v. *Sims*, 135 W. Va. 163, 58 S. E. 2d 654; *Jordan* v. *Sims*, 134 W. Va. 167, 58 S. E. 2d 650; *Price* v. *Sims*, 134 W. Va. 173, 58 S. E. 2d 657.

It is unnecessary to restate those reasons and to re-iterate the many reasons, which to me at least show that the doctrine of moral obligation, as recently applied, is a metaphysical concept which lacks validity in the face of reality.

This Court holds the State of West Virginia is liable for the negligence of its officials, servants and employees in the performance of governmental functions. See *Catron* v. *Sims, supra; Saunders* v. *Sims, supra; Jordan* v. *Sims, supra; Price* v. *Sims, supra; State ex rel Utterback* v. *Sims,*

*supra.* The Court also held that a moral obligation of the State exists by reason of the criminal acts of an escaped convict. *Trust Company* v. *Sims, supra.*

I think the time is here to define and delimit the somewhat unrealistic doctrine of moral obligation of a Sovereign State. The plain inhibitions contained in the Constitution of this State impel me to this conclusion. "The State of West Virginia shall never be made defendant in any court of law or equity * * * ". Section 35, Article VI, Constitution of West Virginia. "The credit of the State shall not be granted to, or in aid of any * * * person; *nor shall the State ever assume, or become responsible for the debts or liabilities of any * * * person.*" (Emphasis supplied) Section 6, Article X.

In the instant case, the claimant obtained a judgment in the Circuit Court of Roane County by private litigation, on the basis of the injuries inflicted on him by Coiner. Having failed in his attempt to collect such judgment, the claimant then filed a claim in the Court of Claims in an effort to obtain from the State on the basis of a moral obligation payment of such judgment.

This Court, in holding the State liable to pay the claimant under the theory of moral obligation has, in effect, applied the doctrine of respondeat superior as if the State were an ordinary employer and a guarantor for the payment of the judgment so obtained. The State of West Virginia is in effect made a surety.

I think the conclusion reached in the instant case is in direct contravention of the express provisions of Section 6, Article X, and Section 35, Article VI, of the Constitution of this State, and is therefore erroneous.

The Court, by reasoning which to me is erroneous, has permitted the public funds to be appropriated for a purely private purpose which renders the provisions contained in our Constitution ineffective and sets them at naught.

I would deny the writ prayed for.